465 P.2d 1018

Ellis Y. PEAY and Geneal A. Peay, his wife, Plaintiffs and Appellants,

v.

B & N INCORPORATED, a Utah corporation; C. E. Slavens and Genela Slavens; Prudential Federal Savings & Loan Association, a corporation; C. H. Dickson Corporation, a corporation; and Slavens Homes, Inc., a corporation, et al., Defendants and Respondents.

No. 11715.

Supreme Court of Utah.

Feb. 26, 1970.

Walter E. Ellett, of Dansie, Ellett & Hammell, Murray, for plaintiffs and appellants.

Harry Pugsley, of Pugsley, Hayes, Watkiss, Campbell & Cowley, Boyden, Tibbals, & Staten, Salt Lake City, for defendants and respondents.

HENRIOD, Justice.

Appeal from a judgment holding that Prudential had a superior first mortgage on property subject of this litigation, and foreclosable as such. The judgment is affirmed, with costs to respondents.

Under familiar rules of appellate review favoring the facts substantially supporting the judgment, such facts which are pertinent fairly may be abstracted as follows:

On June 29, 1962, Peays conveyed the subject property to their son Robert and his wife, by warranty deed.[1] The property apparently was to be used to develop a bowling alley facility. This deed effectively divested the plaintiffs Peay of any title whatever. *Twelve days later*, on July 10, 1962, Robert and his wife likewise divested themselves of any title thereto, by executing and delivering to the B & N Corporation a warranty deed.[2] The next day, July 11, 1962, the then title owner, B & N, mortgaged the property to a bank to secure a loan, obtained for the purpose of erecting a bowling alley building. At that time, the bank had a first mortgage lien on the property. B & N Corp. had record title thereto, and the plaintiffs Peay had nothing in the way of title or other recorded interest in the property. Nonetheless, later on the same day a uniform real estate contract was executed describing the same property, and signed by the plaintiffs Peay, purportedly as Sellers, and B & N purportedly as Buyer, reciting a consideration of $50,000, payable in installments. This contract was recorded on December 15, 1965, some 3½ years after its execution.[3] On October 31, *1966*, B & N, desiring to retire the balance due

---

1. Recorded July 9, 1962.
2. Recorded July 11, 1962.
3. This contract was a filled-in, printed and commonly used form. In Par. 16 thereof, the Seller has an option (A) to be released from its obligations on default, and take possession, (B) to reduce delinquent payment to judgment, etc., *or* (C) "The Seller shall have the right, at his option, and *upon written notice* to the Buyer, to declare the entire unpaid balance hereunder at once due and payable, and *may elect to treat this contract as a note and mortgage, and pass title to the Buyer sub-*

on the existing mortgage, and to pay off the balance of an obligation to the Peays under the uniform real estate contract mentioned, executed an application for a loan from Prudential for $150,000. In a box in the application under "Purpose of Loan" was a notation: "Refinancing Present Mortg. with: Elias Peay, First Sec. State." The Peays made much of this notation in urging its priority over Prudential, who made the loan. The bank holding the first mortgage was paid off. Prudential was advised that the Peays would be paid by applicant out of a reserve fund independent of the requested loan. This circumstance, plus the fact that the Peays did not have the subject property to sell to B & N or anyone else, having theretofore conveyed it away by warranty deed, plus the fact that at the time application for a loan from Prudential was executed there had been no attempt whatever to elect or treat the uniform real estate contract as a mortgage under Paragraph 16(C), certainly would justify an abstract examiner, a title company or Prudential, to give no serious consideration to such contract, which was not changed by the fact of recordation. Prudential issued the loan on November 8, 1966, and to secure it, took a first mortgage.

In September, 1967, Peays, by letter to B & N, notified the latter of its default in payment, and if it failed to pay up, Peays would sue for the balance due under Paragraph 16 of the contract.[4] In October, 1967, they again wrote B & N, this time to say that if the latter didn't pay up, the contract *would be* treated as a mortgage.[5]

On November 14, 1967, Peays instituted this action to foreclose the uniform real estate contract as a mortgage, with priority over the Prudential mortgage executed and recorded a year before.

Peays urge two points on appeal: 1) That the trial court erred in refusing to find the contract between Peay and B & N a mortgage, and 2) That it erred in not finding that recording the contract "intended by the parties" to be a mortgage gave Peays a valid claim thereof.[6]

As to 1): A simple answer to this point is that as between Peay and B & N, at

---

*ject thereto, and proceed immediately to foreclose the same in accordance with the laws of the State of Utah * * *."*

4. This letter apparently had to do with option (B), not (C) treating the contract as a mortgage.

5. It is noted that in neither of the letters was an election made to treat the contract as a mortgage, since they conceded that no such election would be made *if* the delinquencies were resolved.

6. The second point is not too clearly put, but we assume that it means that Peay, by recording the contract, not only claimed it to be a first mortgage but that it was notice to all of the nature and extent of such document *and* any *unrecorded* "intention of the parties," at least so far as Prudential was concerned.

the time of recording, Peays did not have title to the property described in the contract, and the agreement to sell such "something" that the Peays did not have, in no sense encumbered the property. There was no magic in the recordation of a contract purporting to sell something in which the purported seller had no interest. The contract mortgaged nothing since Peays had nothing to mortgage. At best the recording of the nugatory paper could have been a monument to possible evidence of indebtedness. The promissory portion of the contract, without a description of the property, well may have been recorded instead of the contract, in which event Peays' argument would be just as tenable. To say that 3½ years after the contract, Prudential intended to subordinate its first lien to an illusory one based upon the "intentions" of Peays and B & N as to non-existing property recited in the contract, because on an application for loan the Peays were listed in a box designating mortgagees, is ridiculous, particularly since any such application or its terms would be resolved by the subsequent note and mortgage, in neither of which was even the

remotest suggestion that Prudential subordinated itself to any first mortgage held by anyone. In truth, at the time of the Prudential mortgage, there possibly could not have been a mortgage in favor of Peays, since any attempt to make such a claim came about a year after the Prudential mortgage, when Peays attempted to convert the contract into a mortgage. Even then the attempts to effect such a result by letters, were abortive,[7] and there was no real election until at least when the complaint was filed,—and even at *that* time, the Peays had no interest in the property they described in the equally abortive purported contract. Peterson v. Carter,[8] decided by this court, is somewhat akin to the instant case, although involving a so-called Vendor's lien situation.[9]

As to 2): Peays' contention that all the parties "intended" the contract to be a mortgage: The record fairly reflects that Mr. Slaven, a purported co-buyer with B & N under the contract, took the position that *he* did not so consider the document. This would leave his co-buyer, an inanimate corporation, as the only one on the

---

7. Under the very terms of the contract under Paragraph 16(C), the Seller is required 1) to give written notice that 2) the entire unpaid balance is declared due and payable, 3) that the seller elects to treat the contract as a mortgage, and 4) to pass title to the buyer, before proceeding to foreclose, in order to convert the contract to sell into a mortgage. None of these conditions was complied with,

and in fact coul1 not have been complied with since the sellers had nothing to which they could have passel title.

8. 11 Utah 2d 381, 359 P.2d 1055 (1961).

9. See also Pollei v. Burger, 23 Utah 2d 381, 464 P.2d 377, 1970 and cases therein cited, particularly Petrofesn v. Denver & R. G. W. R. Co., 110 Utah 109, 169 P.2d 808 (1946).

buyer's end of the contract that might have "intended" the contract to be a mortgage.

CALLISTER and TUCKETT, JJ., concur.

CROCKETT, Chief Justice (dissenting).

It is true that the senior Peays (herein called the Ellis Peays) had conveyed the property in question to their son, Robert Peay, and his wife by warranty deed on June 29, 1962; and that the latter had similarly conveyed the property to the B & N Corporation on July 10, 1962; and that B & N mortgaged the property to First Security State Bank the next day, July 11, 1962. Under those circumstances there is no question but that the First Security State Bank had a first mortgage which would take preference over any of the parties just mentioned. Conversely, it is true that any purported conveyance after that time by the Ellis Peays could not take priority over, and would have no effect whatsoever upon, the first mortgage lien of said First Security State Bank. This is true of the uniform real estate contract executed the next day by the Ellis Peays as seller and B & N as buyer, by which the latter agreed to pay an obligation on the property to the Ellis Peays.

The fact which impresses me, and causes doubt in my mind about the correctness of the main opinion, is not that the Ellis Peays were parties to and signers of this real estate contract, but the fact that the B & N Corporation, *which was then the record titleholder of the property*, was a party to and a signer of the said contract, reciting the obligation to pay the Ellis Peays for the property. This as stated above, had to be subject to, and subordinate to, the first mortgage lien of the First Security State Bank. However, subject only to that mortgage, I do not see any reason why the B & N Corporation, as the record legal titleholder, could not have conveyed away, or encumbered, its legal title interest to anyone it desired, and by any means it chose, whether by deed, by a trust-deed arrangement, or a second mortgage; and this includes the use of a real estate contract to acknowledge an obligation to the Ellis Peays, which the parties appear to have done. It is to be conceded that the contract contained no words of grant or mortgage from the owner, B & N Corporation, to the Peays, but it did indicate that said corporation recognized an obligation to the Peays on the property, for which the corporation agreed to pay them. In that connection it is important to note that Mr. C. E. Slavens, who incidentally was not called as a witness, was neither buyer nor seller in said real estate contract; and whether he thought the contract between the B & N Corporation as seller and the Ellis Peays as buyer was executed by them as security for a debt (in effect a mortgage) is immaterial to the

issue here. But it is of interest to observe that he and his wife did sign as individuals at the end of the contract, and the only explanation of this is that this was done to guarantee performance of the contract.

While it is indeed somewhat irregular that the contract was not recorded until December 15, 1965, three and one-half years after it was executed, it nevertheless gave constructive notice of its existence to anyone desiring to acquire an interest in the property after that date.[1] This recording was nearly a year before the transaction with Prudential Federal in October-November, 1966, in which it took a mortgage and advanced the money upon which this controversy centers.

In addition to the constructive notice given by recording as discussed above, there is what impresses me as a far more important proposition to be dealt with, that is, Prudential's actual notice of the obligation to the Ellis Peays on this property.[2] In Prudential's application for a loan, typed out by its own personnel in its office, it is shown:

PURPOSE OF LOAN

\* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| Refinancing Present Mortg. with: Ellis Peay | $ 33,494.09 |
| First Sec. State | 66,233.93 |

And on an attached sheet appears the following:

SCHEDULE OF USE OF FUNDS

| | |
|---|---|
| To Pay Ellis Peay | $ 33,494.00 |
| To Pay First Security State Bank | 61,233.00 |
| Pledged Savings | 35,000.00 |
| Loan Costs | 4,500.00 |
| To Slavens | 15,773.00 |
| Total | $150,000.00 |

In regard to this information on the application, Prudential's loan officer, Mark Radmal, admitted that the document showed the obligation to the Ellis Peays:

1. See Sec. 57-3-2, U.C.A.1953.
2. If a party dealing with land has knowledge of facts that would put a reasonable and prudent man upon inquiry he is charged with notice of the facts that reasonable inquiry would reveal. See Toland v. Corey, 6 Utah 392, 24 P. 190, Affd. 154 U.S. 499, 14 S.Ct. 1144, 38 L.Ed. 1062; Mathis v. Madsen, 1 Utah 2d 46, 261 P.2d 952.

Q Now, at the time you received that loan application, *you were aware of the obligation owing to Mr. Peay,* were you not?

A *Yes.*

Q And you were aware, as shown on the second page, it was intended that part of the funds be used to satisfy that obligation?

A Yes.

It thus appears to be without question that the Prudential had actual notice that the B & N Corporation, the record title-holder, which was making the application for the loan, had executed the real estate contract showing an obligation to the Ellis Peays; and that one of the plainly stated purposes of the loan was to discharge that debt. The derelictions which seem to be at the root of the difficulty are that the abstracter did not show this duly recorded contract in his report to Prudential; and further, that a title insurance policy was in fact issued to Prudential. What if any liability there may be upon those parties for such conduct is not involved in this lawsuit.

Whatever Prudential's reasons may have been for not seeing that the debt to the Peays was paid from the proceeds of the loan in accordance with its purpose as stated to them, whether it was because of the abstracter's failure to show the contract, or because C. E. Slavens told them that the debt to the Peays was being taken care of otherwise, or a combination thereof, I am unable to see how either of those reasons is imputable to or affects the rights of the Ellis Peays.

This final observation: If it should somehow be assumed that Mr. Slavens should be considered as a principal to the real estate contract, and/or that his opinion as to what the parties thereto intended has any bearing on the issues in this case, it is pertinent to note that all of the other principals said that the contract was to secure a debt to the Ellis Peays on the property; and further, that it was so referred to in two letters written by Mr. Slavens' attorneys, Ballif and Ballif, in October, 1967, concerning his financial difficulties; e. g., (Ex. 6), the first letter states: "We are now in the process of contacting *all secured creditors, such as Mr. Peay,* and obtaining an agreement of forbearance from suit or foreclosure, upon the condition that we keep all contracts, mortgages or other security rights current during the period of completion and liquidation."

For the foregoing reasons it is my opinion that the correct procedure would be to grant the Ellis Peays the relief sought and to leave the Prudential Federal to whatever remedy it may have against those at fault in causing the difficulty here in-

volved. I would reverse the judgment. (All emphasis added).

JEPPSON, District Judge, concurs in the dissenting opinion of CROCKETT, C. J.

ELLETT, J., does not participate herein.